UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| OBIE ADKINS, | ) | CASE NO. 5:17CV539 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | GEORGE J. LIMBERT |
| | ) | |
| NANCY A. BERRYHILL[1], | ) | |
| ACTING COMMISSIONER OF SOCIAL | ) | MEMORANDUM OPINION & ORDER |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Obie Adkins ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security Administration ("Defendant") denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. In his brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ"): erred by failing to find that his peripheral neuropathy, sleep apnea and psoriasis were not severe impairments; erred by failing to find that his mental impairment did not meet or medically equal Listing 12.02 of the Listing of Impairments; and improperly weighed the opinions of his treating and examining physicians and interpreted medical evidence on her own. ECF Dkt. #12. For the following reasons, the Court REVERSES the decision of the ALJ and REMANDS Plaintiff's case in accordance with this Memorandum Opinion & Order.

## I.    FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed an application for DIB alleging disability beginning July 10, 2013 due to acute and severe memory loss, neuropathy, hypertension, depression, anti-social disorder, hearing loss, and altered mental status. ECF Dkt. #10 ("Tr.") at 162, 184.[2] The Social Security Administration

---

[1]On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2]All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECF system.

("SSA") denied his application initially and upon reconsideration. *Id.* at 108-116. Plaintiff requested a hearing before an ALJ, which was held on August 16, 2016. *Id.* at 38, 117-118.

On September 8, 2016, the ALJ issued a decision denying Plaintiff's application for DIB. Tr. at 20-32. On March 15, 2017, Plaintiff filed the instant suit seeking review of the ALJ's decision. ECF Dkt. #1. He filed a brief on the merits on June 30, 2017 and Defendant filed her merits brief on July 27, 2017. ECF Dkt. #s 12, 13. On August 7, 2017, Plaintiff filed a reply brief. ECF Dkt. #14. On October 27, 2017, the parties consented to the undersigned's jurisdiction. ECF Dkt. #15.

## II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

In her September 8, 2017 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant time period, and she found that since that date, Plaintiff had the severe impairments of: cardiac dysrhythmias, cognitive disorder, anxiety, and depression. Tr. at 22-23. She found that Plaintiff's impairments of celiac disease, gastroesophageal reflux disease, hearing loss, herpes simplex infection, hypokalemia, Payronie's disease, obstructive sleep apnea ("OSA"), hypertension, bronchitis, piriformis syndrome, neuropathy, and restless leg syndrome were not severe impairments. *Id.* at 23.

The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Subpart P, Appendix 1. Tr. at 23-25. After considering the record, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform medium work with the following limitations: never climbing ladders, ropes or scaffolds; avoiding concentrated exposure to extreme heat, extreme cold, and vibration; avoiding exposure to mechanical parts and unprotected heights; performing tasks up to four steps; inability to perform any fast pace production work; being subjected to only few changes in a routine work setting; and having only occasional superficial interaction with supervisors, coworkers, and the general public. *Id.* at 25.

Based upon Plaintiff's age, education, work experience, the RFC, and the vocational expert's ("VE") testimony, the ALJ determined that Plaintiff could not perform his past relevant work, but he could perform jobs existing in significant numbers in the national economy, such as the jobs of

warehouse worker, industrial cleaner, and floor waxer. Tr. at 31-32. In conclusion, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, and he was not entitled to DIB from July 10, 2013, through the date of her decision. *Id.* at 32.

### III. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, *see* 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings

of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found Plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (internal citations omitted).

## V.      LAW AND ANALYSIS

### A.      STEP TWO NON-SEVERE IMPAIRMENTS

Plaintiff first asserts that the ALJ erred by failing to find that his peripheral neuropathy, OSA, and psoriasis were severe impairments. ECF Dkt. #12 at 21-22. The Court finds that the ALJ applied the correct legal standards and substantial evidence supports her determination that Plaintiff's peripheral neuropathy, OSA, and psoriasis were not severe impairments.

At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1521(a).

At step two, the term "significantly" is liberally construed in favor of the claimant. The regulations provide that if the claimant's degree of limitation is none or mild, the Commissioner will

generally conclude the impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. §404.1520a(d). The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out "totally groundless claims." *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir.1985). The Sixth Circuit has construed the step two severity regulation as a "*de minimis* hurdle*"* in the disability determination process. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1988). Under a Social Security policy ruling, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ is required to treat it as "severe." SSR 96-3p (July 2, 1996).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). Once a claimant clears Step Two of the sequential analysis, the ALJ is required to consider all of his or her impairments, severe and non-severe, at every subsequent step of the sequential evaluation process. *See Anthony v. Astrue*, 266 Fed. App'x 451, 457 (6th Cir. 2008)(ALJ's failure to identify an impairment as severe was "legally irrelevant" because the ALJ found other impairments to be severe at Step Two, which allowed the ALJ to consider all impairments in the later steps in the process).

### 1.     OSA and Peripheral Neuropathy

In this case, the ALJ evaluated Plaintiff's peripheral neuropathy and OSA at Step Two of her decision. Tr. at 23. As to Plaintiff's OSA, the ALJ specifically found that the medical evidence showed that Plaintiff did not have "substantial ongoing limitations" relating to OSA besides sleep interruption. *Id*. Plaintiff contends that the ALJ used the improper standard of "substantial ongoing limitations" rather than the proper Step Two standard and he cites to his testimony and medical records in asserting that they are contrary to the ALJ's determination that his OSA was not severe. ECF Dkt. #12 at 22, citing Tr. at 54, 60-61, 458-471, 475, 536-538, 543, 732-737, 884-891, 893, 896-902.

The Court finds that the ALJ applied the proper Step Two standard. Although she used the phrase "substantial ongoing limitations" in a sentence discussing Plaintiff's sleep apnea at Step Two, there is no indication that she used this as the standard of severity and in fact, she cited to the proper regulations and Social Security Rulings for determining severity. Tr. at 21, 23. The ALJ also specifically stated in her Step Two analysis that the evidence indicated that Plaintiff's OSA, among other impairments, imposed "only minimal limitations on the claimant's ability to perform basic work activities." *Id*. at 23. The Court finds that the ALJ thus employed the proper legal standard in determining that Plaintiff's OSA was not a severe impairment.

As to the medical evidence cited by Plaintiff that he contends is contrary to the ALJ's non-severity finding, the standard is whether substantial evidence supports the ALJ's determination that Plaintiff's OSA was not a severe impairment. This Court must affirm the decision of the ALJ if it is supported by substantial evidence, even if substantial evidence exists to the contrary. Moreover, the burden is on Plaintiff to prove the severity of this impairment. *Higgs*, 880 F.2d at 863, citing *Murphy v. Sec'y of Health & Human Servs*., 801 F.2d 182, 185 (6th Cir. 1986).

The ALJ in this case cited to a medical record from a sleep medicine consultation in which Plaintiff reported that he slept a total of 7 hours per night and had a regular sleep/wake schedule. *Id*., at 23, citing Tr. at 475. Plaintiff had indicated that he was previously diagnosed with moderate OSA in 2015 and was started on a CPAP that he used intermittently, but he stopped using in 2015 due to leaks and pressure intolerance. *Id*. at 475. He explained that he tried several masks, but they had limited benefit. *Id*. Upon consultation, Plaintiff was diagnosed with mild cognitive impairment, amnestic type, untreated sleep apnea, and increased stress with interpersonal relationships. *Id*. at 477. He was referred for sleep apnea treatment and a psychology visit, and follow up was recommended in 2-3 months to determine if cognitive change had progressed. *Id*.

Plaintiff fails to explain how the medical evidence that he cites to in the record is contrary to the ALJ's non-severity finding. In fact, one of the records cited by Plaintiff is a June 29, 2016 treatment note which documented Plaintiff's report that he was sleeping better with the recent changes that were made in his sleep medicine. ECF Dkt. #12 at 22, citing Tr. at 893. Other records cited by Plaintiff also support a diagnosis of OSA and treatment, but they do not establish its

severity or indicate that this impairment has "more than a minimal effect" on his ability to perform basic work activities. ECF Dkt. #12 at 22, citing Tr. at 458-471, 475, 536-538, 543, 732-737, 884-891, 893, 896-902. Plaintiff also asserts that "sleep interruption constitutes a significant symptom, as lack of sleep, especially in individuals with dementia, can cause serious symptoms." ECF Dkt. #12 at 22. However, Plaintiff provides no support for this statement and fails to show the impact it would have on performing basic work activities. For these reasons, the Court finds that substantial evidence supports the ALJ's non-severity finding as to Plaintiff's OSA.

The ALJ also specifically addressed Plaintiff's peripheral neuropathy at Step Two, finding that little objective evidence existed regarding this impairment, many examinations revealed that Plaintiff had normal sensation, and medications that Plaintiff took for this impairment controlled his symptoms. Tr. at 23. Plaintiff asserts that the ALJ pointed to no part of the record supporting these findings and "review of the record shows otherwise." ECF Dkt. #12 at 21. Plaintiff further contends that the fact that a claimant takes medication consistently is not a valid reason for finding an impairment to be non-severe. *Id.*

The Court finds that the ALJ applied the proper legal standard at Step Two regarding Plaintiff's peripheral neuropathy and substantial evidence supports her non-severity determination. As with Plaintiff's OSA and other impairments, the ALJ specifically cited to the proper regulations and Social Security Rulings in her decision. Tr. at 21, 23. The ALJ also addressed Plaintiff's neuropathy and found that it, along with some other of Plaintiff's conditions, imposed "only minimal limitations on the claimant's ability to perform basic work activities." *Id*. at 23. The Court finds that this is sufficient to show that the ALJ applied the proper legal standard.

Further, substantial evidence supports the ALJ's determination that Plaintiff's peripheral neuropathy was not a severe impairment. While Plaintiff correctly points out that the ALJ did not cite to specific parts of the record in her Step Two determination supporting her finding that examinations showed normal sensation and little objective evidence of neuropathy, the rest of the ALJ's decision provides citations to these parts of the record. For instance, the ALJ cites to Plaintiff's complaints of chronic foot pain in March of 2014, but she pointed out that Plaintiff's physical examination was generally normal. Tr. at 26, citing Tr. at 348. This examination, dated

March 28, 2014, indicated that Plaintiff presented with chronic foot pain and had tried some medications, and his peripheral pulses upon examination were normal, bilaterally symmetrical and his strength was 5 out of 5. *Id*. at 370. The ALJ also cited to a podiatrist's September 19, 2014 progress note in which Plaintiff reported that he was not able to obtain the neuropathy cream that the doctor had previously prescribed because it was too expensive. *Id*. at 348. Bilateral foot examination at that time showed intact sensation and normal muscle strength. *Id*. Plaintiff was diagnosed with peripheral neuropathy and the doctor was going to submit a pain cream from a different compounding company in order to see if Plaintiff could receive a sample at an affordable price. *Id*. at 349. The ALJ also cited to other records showing normal sensation and she cited to parts of the record indicating that Lyrica was helping Plaintiff's neuropathy. Tr. at 26, citing Tr. at 359, 365, 673, 765. The Court finds that this constitutes substantial evidence to support the ALJ's finding that Plaintiff's peripheral neuropathy was not a severe impairment.

Even if the ALJ committed error in failing to find that Plaintiff's OSA and peripheral neuropathy were not severe impairments, this error was harmless because the ALJ determined that some of Plaintiff's other impairments were severe and she continued on in the disability evaluation process. In *Maziarz*, the Sixth Circuit Court of Appeals held that an ALJ's failure to find one of a claimant's impairments to be severe was not reversible error because the ALJ considered other impairments to be severe and continued onward in the disability evaluation process, where the severe and non-severe impairments could be considered in the remaining steps of the process. 837 F.2d at 244. Similarly here, the ALJ found that Plaintiff's cardiac dysrhythmias, cognitive disorder, anxiety and depression were severe impairments. Tr. at 23. She then proceeded onward in the disability evaluation process and had the opportunity to consider and considered Plaintiff's OSA and peripheral neuropathy in those remaining steps. In fact, the ALJ specifically indicates in her Step Two portion of her decision that despite her non-severity findings, "any limitations caused by such impairments are incorporated in the residual functional capacity set forth below. To the extent the claimant had ongoing foot pain, the reduction to medium work accounted for such a symptom." *Id.* Accordingly, even if the ALJ's erred by failing to find that Plaintiff's OSA and peripheral neuropathy were severe impairments, this constituted harmless error as she specifically indicated

that she considered these impairments and did consider these impairments in proceeding onward in her sequential evaluation.

### 2. Psoriasis

Plaintiff asserts that the ALJ also erred in failing to address his psoriasis and thus the ALJ's finding that this condition was not severe cannot be traced. ECF Dkt. 12 at 22. Plaintiff is correct that the ALJ did not address his psoriasis in her decision. ECF Dkt. #12 at 22. Plaintiff contends that this constitutes reversible error because he received medical treatment for this condition and he cites to many records relating to treatment for psoriasis. *Id.*, citing Tr. at 348-350, 634, 673-678, 690-695, 713-715, 933-938.

However, the burden of establishing that an impairment is severe rests with Plaintiff. *Higgs*, 880 F.2d at 863, citing *Murphy*, 801 F.2d at 185. Plaintiff has not done so here. A mere diagnosis of a condition or the seeking of treatment for a condition does not render an impairment severe. *See Higgs*, 880 F.2d at 863. Moreover, Plaintiff did not identify psoriasis as a medical condition on his disability report or in his appeal of the denial of his initial disability application. Tr. at 184, 225, 252. Nor did Plaintiff's counsel mention psoriasis at the hearing before the ALJ when identifying Plaintiff's disabling impairments in his opening statement. *Id*. at 42. Further, Plaintiff did not identify psoriasis as an impairment when the ALJ asked him at the hearing to explain what prevented him from working on a full-time basis. *Id*. at 53. For these reasons, the Court finds that the ALJ did not commit error, much less reversible error, by failing to address whether Plaintiff's psoriasis was a severe impairment at Step Two of her sequential analysis.

### B. STEP THREE AND LISTING 12.02

Plaintiff also asserts that the ALJ erred in failing to find that his mental health conditions did not meet or medically equal Listing 12.02(A)(2), (3), (4), (5) and (B). ECF Dkt. #12 at 22-23. He contends that the record supports such a finding because his memory impairment and significant problems with perceptual/thinking disturbances, personality changes, and mood disturbances are well-documented. *Id.* Plaintiff cites to the treatment records of Drs. Ruhe, Bonner-Jackson, and Sacco to show that he meets or equals Listing 12.02(A) and he cites to the opinions of Drs. Rucker and Dallara to support a finding that he meets or equals Listing 12.02(B). *Id.* He also challenges

the ALJ's finding that "[n]o treating of examining physician has indicated findings that would satisfy the severity requirements of any listed impairment." *Id.* at 22-23, citing Tr. at 27.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity. 20 C.F.R. § 404.1525. In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987). In order to meet a listed impairment, the claimant must show that his impairment meets all of the requirements for a listed impairment. *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987). An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam). In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan*, 493 U.S. at 531.

Listing 12.02 at the time of the ALJ's decision was entitled "Organic Mental Disorders" and provided that a claimant met the required level of severity for this Listing when paragraphs A and B as stated below were satisfied or when paragraph C was satisfied.

> A.   Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
> 1. Disorientation to time and place; or
>
> 2.Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past; or
>
> 3.Perceptual or thinking disturbances (e.g. hallucinations, delusions); or

4.Change in personality; or

5.Disturbance in mood; or

6.Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

AND

B.      Resulting in at least two of the following:

1.Marked restriction in activities of daily living; or

2.Marked difficulties in maintaining social functioning; or

3.Marked difficulties in maintaining concentration, persistence, or pace; or

4.Repeated episodes of decompensation, each of extended duration;

OR

C.      Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.02 (eff. May 24, 2016 - Sept. 28, 2016).

The Court again notes that review of this case is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's determination. *Abbott*, 905 F.2d at 922. If substantial evidence supports the ALJ's determination that Plaintiff's impairments did not meet or medically equal Listing 12.02, this Court cannot reverse that determination, even if substantial evidence exists to the contrary. The Sixth Circuit has rejected

a heightened articulation standard for the ALJ at Step Three. *Bledsoe v. Barnhart*, 165 Fed. App'x 408, 411 (6th Cir. 2006). In *Bledsoe*, the Sixth Circuit held that the ALJ is under no obligation to spell out "every consideration that went into the step three determination" or "the weight he gave each factor in his step three analysis," or to discuss every single impairment. *Id*. at 411. The Sixth Circuit further held that the entire decision of the ALJ can be reviewed in order to find the required explanation and support as to Step Three findings. *Id*.

Here, the ALJ specifically addressed Listing 12.02 at Step Three and found that Plaintiff's mental impairments did not meet or medically equal the Listing. Tr. at 23-24. She specifically reviewed the paragraph B and C criteria of Listing 12.02 in making this determination. *Id*. at 24. Since she did not review paragraph A of the Listing in her decision and proceeded right to paragraphs B and C, the Court finds that the ALJ must have determined that Plaintiff met the criteria of paragraph A, despite Defendant's post-hoc rationale and assertion to the contrary. Tr. at 23-24.

As to the paragraph B criteria, the ALJ specifically reviewed each of them and found that Plaintiff was moderately restricted in his daily living activities, his social functioning, and in his concentration, persistence or pace, and he therefore did not have an extreme limitation or two marked limitations in these areas as required to satisfy the Listing. Tr. at 24. As to daily living activities, the ALJ cited to Plaintiff's reports that he cared for his personal hygiene, his pets, and his finances, and he read and watched television, prepared meals, and he was able to go shopping. *Id*., citing Tr. at 228, 241, 341. The Court finds that the ALJ applied the proper Step Three standard here and her citations constitute substantial evidence to support a moderate restriction in Plaintiff's daily living activities.

In the area of social functioning, the ALJ found that Plaintiff had moderate restrictions, citing to Plaintiff's reports of significant anger and interpersonal problems, but noting that medication helped control these symptoms and Plaintiff was cooperative at all examinations and was able to go shopping without problems. Tr. at 24, citing Tr. at 54. Plaintiff did report at his hearing before the ALJ that medication helped tremendously with his anger management issues. *Id*. at 54. And while Plaintiff did testify that he had trouble with interpersonal relationships, the ALJ indicated that Plaintiff was cooperative at his examinations and he was able to go shopping without any problems

-12-

with interpersonal relationships. *Id.* at 24; 62. The Court finds that the ALJ applied the proper standard to this part of her Step Three analysis. Further, and while the ALJ could have provided better support for her finding here, her analysis meets the substantial evidence standard as to her finding of a moderate restriction for Plaintiff in the area of social interaction.

The ALJ also found that Plaintiff was moderately restricted in the areas of concentration, persistence or pace. Tr. at 24. She cited to Plaintiff's complaints of severe memory deficits, but she noted that Plaintiff's cognitive deficits were described as mild. *Id.* at 24; 228, 926. The Court notes that Plaintiff was diagnosed with a mild cognitive impairment by his doctors based on MRIs of his brain. *Id.* at 537. The ALJ also explained that Plaintiff testified that he read and watched television, and there was no indication that he could not follow what he read or watched. *Id.* at 24. The ALJ further explained that Plaintiff was able to follow the proceedings before her and answered questions in an appropriate manner, and he indicated that he took care of his finances, which she found required a heightened level of attention. *Id.* at 24, citing Tr. at 61. Again, while the ALJ could have provided better support for this finding, and some evidence exists to the contrary, the ALJ applied the proper legal standard and substantial evidence supports her determination of a moderate restriction in this area.

The ALJ also found that Plaintiff had no episodes of decompensation. Tr. at 24. Plaintiff does not challenge this finding.

For these reasons, and based upon the standard required for Step Three, the Court finds that the ALJ applied the proper standard for her Step Three analysis as to Listing 12.02 and substantial evidence supports her determination that Plaintiff's mental impairments did not meet or medically equal Listing 12.02.

### C.       OPINIONS OF DRS. RUCKER AND DALLARA

Plaintiff also asserts that the ALJ erred by rejecting the opinions of every treating and examining physician in the record and improperly attributed more weight to the opinions of non-examining state agency doctors and relied upon her own interpretation of the medical evidence. ECF Dkt. #12 at 19-21. He specifically refers to the ALJ's treatment of the opinions of Drs. Rucker and Dallara as the opinions that the ALJ improperly rejected. *Id.*

-13-

A review of the relevant medical evidence shows that on May 4, 2010, Plaintiff presented to the emergency room complaining of an altered mental status, which included confusion, and dizziness that started early that morning. Tr. at 285. He related that he was driving to work and called his boss and was speaking in fragmented sentences so he returned home and told his wife that he felt dizzy. *Id.* at 296. Plaintiff's wife reported that Plaintiff was speaking in full sentences, but he was very quiet and was staring straight ahead. *Id.* He had reported left arm tingling and chest tightness and his wife checked his blood pressure, which was 185/113, although his blood pressure had been well-controlled for the last three years on medication. *Id.* Plaintiff's wife indicated that he told her that he fell down, although Plaintiff denied telling his wife this. *Id.* Upon examination, his short-term memory and long-term memories were impaired and he was scared and confused. *Id.* at 286. Plaintiff was assessed as having acute transient altered mental status with vertigo and dysarthria and left arm tingling, most likely transient ischemic attack ("TIA"), less likely a seizure, less likely post-concussive syndrome, or hypertensive encephalopathy. *Id.* at 297. He was also assessed with hypertension with transient hypertensive emergency, hyperlipidemia, and atypical chest pain. *Id.* He was started on medication and MRIs of the brain and extracranial and intracranial vessels were ordered. *Id.* at 298. The MRIs were normal, as well as an EEG, and Plaintiff was treated with Plavix for the possibility of a TIA, but neurology did not believe that Plaintiff had a TIA. *Id.* at 302, 313-314. A brain CT showed evidence of dolichoectasia involving the major vessels in the skull base region, most likely on the basis of hypertension. *Id.* at 320. His discharge diagnoses were transient episode of acute altered mental status, vertigo and dysarthria, dyslipidemia with low HDL and elevated triglycerides, and hypertension with transient hypertensive emergency. *Id.* at 302.

On March 19, 2014, Dr. Rucker, Plaintiff's treating physician, completed a form indicating that he first treated Plaintiff on January 14, 2009 and last saw him on January 1, 2014. Tr. at 324. He listed Plaintiff's diagnoses as including dementia and depression. *Id.* When asked to describe the nature and symptoms of Plaintiff's medical condition, Dr. Rucker wrote, "Dementia - onset of 1 year primary reason for inability to work. Progressively worsening." *Id.* Dr. Rucker indicated that Plaintiff's short-term memory failed and he was fired from a job because of his inability to

remember closing procedures. *Id.* When asked to provide consultative/diagnostic testing that he had regarding Plaintiff's condition, Dr. Rucker wrote that none was available. *Id.* When asked if Plaintiff was on any medications, Dr. Rucker wrote that Plaintiff had not started medications for dementia because he was waiting to rule out an organic reason for Plaintiff's dementia and Plaintiff had poor compliance with medications likely due to his memory. *Id.* at 325. When asked to describe any limitations that Plaintiff's condition has on his ability to sustain work activity and to be specific as to Plaintiff's ability to concentrate, think clearly, communicate and relate with others, follow instructions, take care of personal needs and to function independently if a psychological condition was involved, Dr. Rucker wrote "see above." *Id.*

On May 12, 2014, Dr. Ruhe conducted a consultative examination and noted Plaintiff's chief complaint as an antisocial disorder. Tr. at 328. Dr. Ruhe indicated that Plaintiff was 63 years old and reported that he was diagnosed with antisocial disorder when he was 38. *Id.* Plaintiff described a "convoluted" story surrounding his diagnosis, which included him placing a tap on his ex-wife's phone during the divorce to show that she was smuggling drugs into a state penitentiary to her brother using their minor child. *Id.* He related that the judge over the divorce case nevertheless sided with his ex-wife and threatened to put him in jail for tapping the phone. *Id.* He told Dr. Ruhe that he felt that the judge needed to be punished and he laid out a very specific plan to murder him. *Id.* He reported that he did not carry the plan out because he was waiting for his mother to pass away so she would not find out but the judge died in the interim. *Id.* Plaintiff related thoughts of hurting other people because he believed that they needed to be punished. *Id.* He explained that he was on medication and his anger issues were much better since taking this medication, although he still continued to have homicidal ideation. *Id.* Plaintiff also told Dr. Ruhe that he was very forgetful and Dr. Ruhe noted that during her interview with him, Plaintiff often interrupted her in the middle of a question in order to answer a prior question before he would forget. *Id.*

Dr. Ruhe conducted a physical examination and assessed Plaintiff with antisocial disorder with continuing homicidal ideation. Tr. at 331. She recommended that he be assessed by a psychiatrist even though he had no current homicidal ideation and was on medicine. *Id.* She opined

that given the information she had concerning Plaintiff, she found that "he is inappropriate to be in any type of work setting" until his mental illness was under good control. *Id.*

On June 18, 2014, Plaintiff presented to Dr. Dallara, Ph.D, for a psychological evaluation. Tr. at 339. He administered the Wechsler Adult Intelligence Scale-IV ("WAIS-IV) and interviewed Plaintiff for the evaluation. *Id.* Plaintiff identified his chief complaint as memory problems and blacking out. *Id*. He reported that he last worked in July of 2013 at Lowe's as an assistant manager but he was terminated from employment because he made frequent mistakes due to memory issues, such as forgetting to turn off all of the lights, locking doors or other closing procedures. *Id*. at 340. Plaintiff described his daily living activities as caring for his personal hygiene, performing household chores, watching television and enjoying his motorcycle and sometimes camping. *Id*. at 341.

Dr. Dallara found that Plaintiff was appropriately dressed and he was cooperative, although he had memory difficulties. Tr. at 341. He also noted that Plaintiff's speech was intelligible and spontaneous, but there were circumlocutions at times and he appeared to have difficulty expressing his thoughts. *Id.* Dr. Dallara found that Plaintiff was alert and oriented, but he required reinstruction for the WAIS-IV as he would forget the task at hand. *Id*. at 342. The WAIS-IV indicated that Plaintiff's verbal comprehension was in the average range at 93, perceptual reasoning was in the low-average range of 86, working memory was in the borderline range at 74, processing speed was also borderline at 76, and he had a full-scale IQ of 80, which was low-average. *Id.* Dr. Dallara noted that Plaintiff showed a relative deficit in his short-term memory. *Id.*

On the basis of his interview and the WAIS-IV, Dr. Dallara diagnosed Plaintiff with cognitive disorder and mood disorder, not otherwise specified, and he rated his global range of assessment at 55, indicative of moderate symptoms. Tr. at 342. Dr. Dallara opined that Plaintiff would be able to manage his own funds if granted. *Id*. at 343. He also opined that "Plaintiff would be expected to understand instructions in a work setting that was consistent with average intellectual abilities. However it appears he would have difficulties remembering and carrying out simple one or two-step instructions." *Id*.

As to Plaintiff's abilities to maintain attention and concentration, and to maintain persistence and pace to perform simple tasks and multi-step tasks, Dr. Dallara opined that even though Plaintiff did not report a pattern of leaving work due to mental or emotional difficulties, he did indicate that he was terminated from employment due to mental difficulties. Tr. at 343. Thus, Dr. Dallara opined that "there was no direct evidence during the examination to suggest impairment to his pace; however at times he would forget the task at hand and require reinstruction. Additionally at times he would lose his train of thought. This may prompt performance concerns by others." *Id*. As to responding appropriately to supervision and to co-workers in a work setting, Dr. Dallara opined that Plaintiff would have difficulties relating to others, including co-workers and supervisors, due to his mood and cognitive issues. *Id.* Dr. Dallara further opined that Plaintiff would also have difficulties withstanding stress and pressure associated with daily work activities due to his cognitive problems and mood issues. *Id.* at 344.

September 30, 2014 treatment notes from treating physician Dr. Rucker indicated that Plaintiff presented complaining of severe confusion as he was taking his wife to work, swerved in the car, and was awakened in the middle of the street and did not remember how he got home. Tr. at 765. He also complained of blurry vision. *Id*. Dr. Rucker's physical examination of Plaintiff was normal and he assessed amnestic syndrome, blurred vision and TIA. *Id*. at 766. He ordered a brain MRI and continued Plaintiff's medications. *Id*.

On October 17, 2014, Plaintiff underwent a brain MRI which was compared with the June 18, 2014 brain MRI. Tr. at 763. The results showed mild generalized atrophy which was stable, a normal ventricular system, and a few scattered periventricular white matter, which were unchanged and probably represented mild changes of chronic small vessel ischemia, and minimal mucousal thickening in the anterior ethmoid air cells. *Id.* The impression was that there was no change from the June 18, 2014 MRI. *Id*. at 764.

On December 16, 2014, Dr. Dallara conducted another psychological evaluation of Plaintiff for the agency. Tr. at 390. He interviewed Plaintiff and administered the Wechsler Memory Scale-IV ("WMS-IV"). *Id*. Dr. Dallara noted that prior to this evaluation, Plaintiff called him and apologized for missing his scheduled appointment, even though it had not yet taken place. *Id*. at

392. Dr. Dallara further noted that a week later, Plaintiff called again and apologized for missing the evaluation, which had not yet occurred. *Id.* At the evaluation, Plaintiff reported that he forgets why he goes into rooms, forgets conversations, and forgets things that he is supposed to do. *Id.*

Dr. Dallara noted difficulties in administering the WMS-IV, as even though Plaintiff was cooperative, he had difficulties with his memory as he would repeat the questions and required reinstruction and would forget the task at hand. Tr. at 393. The WMS-IV results indicated that Plaintiff had an auditory memory index of 75, visual memory of 74, visual working memory of 73, immediate memory index of 77, and a delayed memory index of 66. *Id.* Dr. Dallara opined that Plaintiff's delayed memory score was in the extremely low range, and his other scores fell in the borderline range. *Id.* He indicated that the results suggested retention deficits. *Id.*

On the basis of his interview and the WSM-IV, Dr. Dallara diagnosed Plaintiff with cognitive, mood and anxiety disorders, not otherwise specified, and he rated his global range of assessment at 48, indicative of severe symptoms. Tr. at 393. Dr. Dallara opined that Plaintiff would not be able to manage his own funds if granted due to his significant memory issues. *Id.* at 394. He opined that "Plaintiff would be expected to understand instructions in a work setting that was consistent with average intellectual abilities. However he would have significant difficulties remembering and carrying out simple one or two-step instructions." *Id.*

As to Plaintiff's abilities to maintain attention and concentration, and to maintain persistence and pace to perform simple tasks and multi-step tasks, Dr. Dallara opined that there was no direct evidence to suggest an impairment in these areas, except that Plaintiff often reported forgetting what he was doing and his difficulties tracking the flow of conversation may prompt performance concerns by others. Tr. at 394-395. As to responding appropriately to supervision and to co-workers in a work setting, Dr. Dallara opined that "[e]xcept for his circumlocutions and a tendency to lose his train of thought, he made an essentially unremarkable social presentation during the examination." *Id.* at 395. However, Plaintiff reported that he had been fired due to unbecoming conduct and Plaintiff's depression, anxiety and cognitive issues would cause difficulties for Plaintiff relating to others, including co-workers and supervisors. *Id.* Dr. Dallara further opined that Plaintiff

would also have difficulties withstanding stress and pressure associated with daily work activities due to his depression, anxiety and cognitive problems. *Id.* at 344.

On January 28, 2015, Plaintiff presented to Physician's Assistant ("PA") Loughrin at the Cleveland Clinic Center for Brain Health for evaluation of a progressive cognitive change. Tr. at 564. Plaintiff reported that he lost his job due to memory issues in 2013 when he was a manager at Lowe's and left money out and doors unlocked. *Id*. at 566. He "took social security early" and applied for disability. *Id*. Plaintiff believed that he had a progressive cognitive change over the last 4 years and his wife indicated that Plaintiff would tell the same story repeatedly and he was forgetting appointments and where he was driving at times. *Id*. Plaintiff also reported having 4 episodes of acute confusion/memory loss/disorientation but he could not remember those issues. *Id*. Besides the one that resulted in his emergency room visit and hospital admission, Plaintiff reported three additional episodes, with the most recent two months prior to this visit. *Id*. Plaintiff and his wife indicated that Plaintiff was driving her to work when Plaintiff was not making sense when he was talking and then ran stop signs and swerving across traffic. *Id*. He reported short-term memory issues and word-finding difficulties. *Id*. at 567.

PA Loughrin's mental status examination of Plaintiff showed normal results, but cognitive testing showed delayed recall issues without cues. Tr. at 567. She assessed Plaintiff with cognitive change and requested Plaintiff's prior records and MRI, ordered blood work, an EEG, a repeat MRI, neuropsychological testing, and discussed increasing medications that Plaintiff was taking in the future and a possible lumbar puncture. *Id*. at 568.

A March 5, 2015 brain MRI showed mild atrophy and nonspecific white matter changes, which were said to likely reflect chronic microvascular ischemia. Tr. at 559, 582-584.

On March 5, 2015, Plaintiff was referred to Dr. Bonner-Jackson, Ph.D. for a neuropsychological evaluation at the request of PA Loughrin. Tr. at 558. Plaintiff reported that he was involved in a motor vehicle accident in 1986 where he lost consciousness for several hours and was hospitalized 3-4 days. *Id*. at 559. He indicated that he had a Bachelor's Degree in Accounting and he worked as a State Trooper, but was fired in 1987 due to anger issues. *Id*. at 560. He reported working in retail for 16 years and recently managed a Lowe's store, but was fired due to forgetting

to lock doors and leaving money out. *Id.* He indicated that he had been married three times and had five children and two step-children. *Id.*

Dr. Bonner-Jackson noted normal behavioral observations, and his neuropsychological evaluation revealed isolated impairments and relative inefficiencies on memory tasks. Tr. at 560. Testing showed extremely low word-list learning, initial learning, delayed recall and recognition accuracy, and average with borderline impaired delayed recall for highly contextualized information *Id.* Non-verbal memory measure showed borderline impairment with initial learning of geometric shapes with average delayed recall. *Id.* He noted that Plaintiff's performance across measures of language, visual spatial skills, attention, executive functioning, and processing speed ranged from low average to very superior. *Id.* Mood screening measures showed minimal depression and mild anxiety. *Id.*

In summary, Dr. Bonner-Jackson reported that the results indicated that Plaintiff had a relatively formal memory disturbance with a nonspecific pattern. Tr. at 560. However, due to Plaintiff's report of a strong family history of dementia, Dr. Bonner-Jackson was concerned about a possible neurodegenerative process or seizure activity. *Id.* He diagnosed Plaintiff with amnestic mild cognitive impairment. *Id.* A one-year retest was recommended, as well as Plaintiff's use of memory aids. *Id.* at 561.

On March 26, 2015, PA Loughrin noted that Plaintiff presented for follow up and she informed him that the MRI of his brain showed no acute intracranial process, but mild volume loss and nonspecific white matter changes. Tr. at 546, 921-922. PA Loughrin assessed Plaintiff with mild cognitive impairment and noted concern about the underlying process being Alzheimer's Disease or seizure disorder. *Id.* at 546, 922. She scheduled a lumbar puncture and increased Plaintiff's medication. *Id.*

Plaintiff underwent a lumbar puncture on April 6, 2015. Tr. at 557. Treatment notes dated May 8, 2015 from PA Loughrin noted that Plaintiff had a normal mental status examination and the results of lumbar puncture testing did not indicate Alzheimer's Disease. *Id.* at 537, 543. He was assessed with a mild cognitive impairment, episodic cognitive changes, with no recent episodes, and

untreated sleep apnea.  *Id.*  PA Loughrin indicated that memory testing may be repeated next year, and Plaintiff should return in six months for a follow-up.  *Id.*

Follow-up treatment notes from the Center for Brain Health dated February 19, 2016 show that Plaintiff was followed for his mild cognitive impairment.  Tr. at 399.  PA Loughrin noted that testing did not show evidence of neurodegenerative disease, but Plaintiff continued to complain of worsening short-term memory loss.  *Id*.  He indicated that he tried to work at a friend's convenient store, but he could not work the cash register correctly.  *Id*.  He noted several additional stressors in his life, including a separation between him and his wife, who was escorted to the emergency department at this visit due to his being actively suicidal with intent and a plan.  *Id*.  Plaintiff also noted that he allowed two of his drug-addicted children to move into his house and they sold his things, including his furniture.  *Id.*  He reported being independent with his activities of daily living and he enjoyed gardening and visiting his friend.  *Id.* at 476.  Plaintiff was assessed with a mild cognitive impairment, amnestic type, and his cognitive assessment test results showed a worse score than before.  *Id*. at 477.  He was also assessed with untreated sleep apnea and increased stress with interpersonal relationships.  *Id*.  PA Loughrin indicated that Plaintiff would be followed over time due to a very strong family history of dementia.  *Id*.  A sleep consultation and psychology consultation were also ordered.  *Id*.

Dr. Rucker's progress notes dated June 15, 2016 indicated that Plaintiff presented for completion of his social security paperwork.  Tr. at 660, 797.  He noted that Plaintiff complained of sleep difficulty but was sleeping well with Ambien.  *Id.*  Plaintiff complained of some issues with anger and anxiety, but he reported that he was doing better with the combination of medications that he was prescribed.  *Id*.  He also complained of depression, poor energy and appetite, but he thought that the combination of Celexa and Buproprion were doing the best job for him.  *Id*.  Plaintiff also complained of memory loss but indicated that Aricept was helping.  *Id*.

Upon examination, Dr. Rucker noted that Plaintiff clearly had memory deficits, especially short-term memory deficits.  Tr. at 661.  He assessed, among other conditions, early onset Alzheimer's dementia without behavioral disturbance and major depression in remission.  *Id.*  He continued Plaintiff's medications for these conditions.  *Id*. at 662.

On June 15, 2016, Dr. Rucker completed a form regarding Plaintiff's abilities to perform work-related activities on a daily basis. Tr. at 456. Dr. Rucker opined physical restrictions for Plaintiff based upon his neuropathy, but also opined that Plaintiff would be off-task for 5% of the workday, he would need to lie down for 30 minutes of an 8-hour day if performing sedentary work and he would never need to take unscheduled breaks. *Id.* at 457. When asked for the medical findings supporting his opinion, Dr. Rucker indicated that "[m]ost important, pt has dementia, likely Alzheimer's. Pt was fired from previous job due to inability to close store properly, was forgetting money, locks, etc." *Id.* Dr. Rucker further indicated that Plaintiff's "[p]rimary reason for SSI is dementia." *Id.*

On July 20, 2016, Plaintiff presented to Dr. Sacco, Ph.D, for a psychological evaluation at the request of PA Loughrin. Tr. at 877. She requested an opinion as to Plaintiff's memory, mood, sleep and recommendations. *Id.* Plaintiff indicated that his most bothersome symptom was his memory. *Id.* at 878. He reported that he relieved his stress by riding his motorcycle and enjoying his family. *Id.* at 880.

Dr. Sacco reported that Plaintiff was alert and oriented, cooperative, had normal speech, normal eye contact, with logical, coherent and relevant thoughts, no psychotic features, adequate insight and judgment, grossly intact cognition and no evidence of suicidal or homicidal ideations. Tr. at 880. Dr. Sacco diagnosed Plaintiff with mood disorder, not otherwise specified, and a rule out of bipolar disorder. *Id.* at 881. He rated Plaintiff's GAF at 60, indicative of moderate symptoms. *Id.* Dr. Sacco reviewed emergency access procedures with Plaintiff, gave him his contact information, discussed preventative measures such as exercise and sleep exercise, and referred him to various agencies for psychoeducation, resources, social activities and social support services. *Id.*

Treatment notes from PA Loughrin dated June 29, 2016 indicate that Plaintiff's cognitive testing results were back to the baseline score of the first test results and Plaintiff's general mental status examination was otherwise normal. Tr. at 885. Plaintiff indicated that things were not changing or getting worse for him. *Id.* at 893. She assessed mild cognitive impairment, back to baseline, depression, and sleep apnea. *Id.* at 885. She explained to Plaintiff that the lack of

progression in cognitive decline and the negative lumbar puncture did not support an underlying neurodegenerative process like Alzheimer's Disease. *Id.* She discontinued the Aricept for three weeks and told Plaintiff it was "OK to send the forms for disability." *Id.*

On August 15, 2016, Dr. Rucker completed a medical source assessment of Plaintiff's mental abilities to perform work-related activities. Tr. at 914. He opined that Plaintiff could not perform the following activities on a regular, reliable and sustained schedule: remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; perform activities within a schedule, regularly attend or be punctual; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. *Id*. at 914-915. Dr. Rucker further opined that Plaintiff would be distracted more than 20 percent of the workday or workweek from: maintaining attention and concentration for extended periods of time; working in coordination with others without being distracted by them; interacting appropriately with the general public; and setting realistic goals or making plans independently of others. *Id.* He further found that Plaintiff would have noticeable difficulty from 11-20% of the workday or workweek from getting along with coworkers without distracting them or exhibiting behavioral extremes; and Plaintiff would have no observable limitations in: understanding, remembering, and carrying out very short, simple instructions; making simple, work-related decisions; asking simple questions or requesting assistance; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; and being aware of normal hazards and taking appropriate precautions. *Id.*

In addition, Dr. Rucker opined that Plaintiff would be absent from work more than four days per month due to his impairments or treatment, he would be off-task over 20% of an 8-hour workday, and he explained that the medical findings supporting his opinion were Plaintiff's diagnosis with dementia/Alzheimer's Disease and his anger "provoked easily." Tr. at 915-916. He further indicated that Plaintiff was fired from a job because he was unable to lock doors, lock a safe,

and left out money, he has trouble remembering to take his pills regularly at home, and he would have trouble with any complex tasks or instructions to follow. *Id.* at 916.

On August 5, 2016, Plaintiff presented to Dr. Sacco in order to complete the MMPI-2RF psychological testing. Tr. at 926. Dr. Sacco noted that Plaintiff generated a considerably larger than average number of infrequent responses, which occurred in individuals with genuine, severe psychological difficulties who report credible symptoms. *Id.* Dr. Sacco noted that Plaintiff also reported a much larger than average number of somatic symptoms, which is rarely described by individuals with genuine medical conditions. *Id.* at 926-927.

On the basis of Plaintiff's responses, Dr. Sacco opined that Plaintiff was very likely to be prone to developing physical symptoms in response to stress. Tr. at 927. He further opined that Plaintiff's responses indicated significant emotional distress and serious and pervasive thought dysfunction, with Plaintiff's prominent persectorial ideation that likely raises the level of paranoid delusions, including a strong belief that people are seeking to harm Plaintiff. *Id.* Dr. Sacco further indicated that Plaintiff was also likely to experience substantial thought disorganization, to present with significantly impaired reality testing, and to experience serious impairment in occupational and interpersonal functioning. *Id.* Dr. Sacco also opined that Plaintiff had indicated significant, generalized, acting-out behavior and he was very likely to be restless and become bored and to be acutely over-activated as manifested by poor impulse control, aggression, mood instability, excitability, and sensation-seeking, risk-taking, or other forms of under-controlled irresponsible behavior. *Id.* Dr. Sacco noted that Plaintiff reported a significant history of antisocial behavior and is likely to have difficulties with individuals in position of authority. *Id.*

Dr. Sacco diagnosed Plaintiff with mood disorder, not otherwise specified, and he indicated rule out diagnoses of bipolar disorder, obsessive-compulsive disorder, post-traumatic stress disorder, intermittent explosive disorder, major depressive disorder, and schizoaffective disorder. Tr. at 928. He also diagnosed Plaintiff with antisocial personality traits and paranoid personality traits. *Id.* He rated Plaintiff's GAF as 55, indicative of moderate symptoms. *Id.* In a part of the evaluation report entitled "Areas for Further Evaluation," Dr. Sacco indicated that inpatient treatment should be considered due to hypomania, paranoid delusional and disordered thinking. *Id.* He also noted the

need for antipsychotic, mood stabilizing and anxiolytic medications. *Id.* He further noted that need to determine the origin of Plaintiff's malaise and cognitive complaints. *Id.* Dr. Sacco indicated that Plaintiff could benefit from intensive outpatient psychotherapy with psychiatric medication evaluation and management. *Id.* at 929.

On August 22, 2016, Dr. Sacco reviewed Plaintiff's MMPI-2RF results with him and the need for psychiatric and psychology services closer to his home. Tr. at 931. Dr. Sacco conducted a mental status examination and noted that Plaintiff had a flat mood and affect, he was oriented, had paranoid delusions, thoughts of death, but not suicide or homicide, and he had fair insight and judgment. *Id.* at 923. Dr. Sacco diagnosed Plaintiff with mood disorder, bipolar I disorder, most recent episode depressed and moderate. *Id.* He also diagnosed Plaintiff with personality disorder, not otherwise specified, and he rated Plaintiff's GAF at 60, indicative of moderate symptoms. *Id.*

A claimant's RFC is an assessment of the most that a claimant "can still do despite his limitations." 20 C.F.R. §§ 416.945(a)(1). An ALJ must consider all of a claimant's impairments and symptoms and the extent to which they are consistent with the objective medical evidence. 20 C.F.R. § 416.945(a)(2)(3). The claimant bears the responsibility of providing the evidence used to make a RFC finding. 20 C.F.R. §§ 416.945(a)(3). However, the RFC determination is one reserved for the ALJ. 20 C.F.R. § 416.946(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed.Appx. 149, 157 (6th Cir. 2009) ("The responsibility for determining a claimant's [RFC] rests with the ALJ, not a physician."); SSR 96-5p, 1996 WL 374183, at *5. Social Security Ruling ("SSR") 96-8p provides guidance on assessing RFC in social security cases. SSR 96-8p. The Ruling states that the RFC assessment must identify the claimant's functional limitations and restrictions and assess his or her work-related abilities on a function-by-function basis. *Id.* Further, it states that the RFC assessment must be based on *all* of the relevant evidence in the record, including medical history, medical signs and lab findings, the effects of treatment, daily living activity reports, lay evidence, recorded observations, effects of symptoms, evidence from work attempts, the need for a structured living environment and work evaluations. *Id.*

An ALJ must give controlling weight to the opinion of a treating source if the ALJ finds that the opinion is well-supported by medically acceptable clinical and diagnostic techniques and not

inconsistent with the other substantial evidence in the record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). If an ALJ decides to discount or reject a treating physician's opinion, she must provide "good reasons"[3] for doing so. Social Security Rule ("SSR") 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson,* 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he or she rejected or discounted the opinions and how those reasons affected the weight afforded to the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243 (citing *Wilson*, 378 F.3d at 544).

The Sixth Circuit has noted that, "while it is true that a lack of compatibility with other record evidence is germane to the weight of a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule." *Friend v. Comm'r of Soc. Sec.*, No. 09-3889, 2010 WL 1725066, at *8 (6th Cir. 2010). The Sixth Circuit has held that an ALJ's failure to identify the reasons for discounting opinions, "and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Parks v. Social Sec. Admin.*, No. 09-6437, 2011 WL 867214, at *7 (6th Cir. 2011) (quoting *Rogers*, 486 F.3d at 243 ). However, an ALJ need not discuss every piece of evidence in the administrative record so long as he or she considers all of a claimant's medically determinable impairments and the opinion is supported by substantial evidence. *See* 20

---

[3] The Court notes that the SSA has changed the treating physician rule effective March 27, 2017. *See* 20 C.F.R. § 416.920. The SSA will no longer give any specific evidentiary weight to medical opinions, including affording controlling weight to medical opinions. Rather, the SSA will consider the persuasiveness of medical opinions using the factors specified in their rules and will consider the supportability and consistency factors as the most important factors.

C.F.R. § 404.1545(a)(2); *see also Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010) (citation omitted).

Opinions from agency medical sources is considered opinion evidence. 20 C.F.R. § 404.1527(f). The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 404.1527(f)(2)(ii). More weight is generally placed on the opinions of examining medical sources than on those of non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(1). However, the opinions of non-examining state agency medical consultants can, under some circumstances, be given significant weight. *Hart v. Astrue*, 2009 WL 2485968, at *8 (S.D.Ohio Aug.5, 2009). This occurs because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling ("SSR") 96–6p, 1996 WL 374180.

Thus, the ALJ weighs the opinions of agency examining physicians and agency reviewing physicians under the same factors as treating physicians including weighing the supportability and consistency of the opinions, and the specialization of the physician. *See* 20 C.F.R. § 416.972(d), (f). However, the Sixth Circuit Court of Appeals has held that the regulation requiring an ALJ to give good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of several examining physicians' opinions over others. *See Kornecky v. Comm'r of Soc. Sec.*, No. 04-2171, 167 Fed. App'x 496 (6th Cir. Feb.9, 2006), unpublished.

In the instant case, the ALJ addressed the opinions of Dr. Rucker and Dr. Dallara. Tr. at 28-30. She gave only some weight to Dr. Rucker's opinion concerning Plaintiff's mental restrictions relating to his memory impairment. *Id*. at 29. She explained that the evidence did not support a finding that Plaintiff had such severe memory problems to prevent him from performing any work

and the record did not support Dr. Rucker's extreme mental limitations for Plaintiff. *Id*. She found that while the evidence showed that Plaintiff had depression and anxiety, "his cognitive impairment was generally described as mild. Moreover, he retained cooperative behavior, logical thoughts, normal activity, and intact judgment." *Id*.

These reasons offered by the ALJ for attributing less than controlling weight to Dr. Rucker's opinion fail to constitute good reasons. The ALJ fails to explain how cooperative behavior, logical thoughts, normal activity, and intact judgment negate a severe memory impairment or Dr. Rucker's limitations for Plaintiff based upon his dementia. Furthermore, the ALJ incorrectly concluded that Plaintiff's cognitive deficits were generally described as mild. Rather, Plaintiff was diagnosed with a mild cognitive impairment. Without medical support, the ALJ cannot conclude that a mild cognitive impairment diagnosis leads to a finding that Plaintiff's memory problems were not as severe as Dr. Rucker opined or required the restrictions that Dr. Rucker placed upon Plaintiff's mental abilities.

The Court is not finding that controlling weight should be afforded to Dr. Rucker's opinion. The Court is, however, remanding this case to the ALJ to determine whether good reasons exist for affording less than controlling weight to Dr. Rucker's opinion and to articulate good reasons for affording less than controlling weight relating to Dr. Rucker's opinion as to Plaintiff's dementia and memory problems if she again chooses to do so.

The ALJ also addressed Dr. Dallara's opinions in her decision. Tr. at 28. She noted his findings and conclusions, and indicated that she granted little weight to Dr. Dallara's opinions. *Id*. She explained that "the treatment notes showed that the claimant had ongoing memory impairment and depressive symptoms. However, the record shows that he could complete simple household tasks and his largely cooperative behavior indicates that he could interact with others on a superficial basis. *Id*. at 28-29. The ALJ also found that, "[f]urthermore, the claimant's cognitive deficits were generally described as mild, which contradicts the severe memory limitations that Dr. Dallara described." *Id*. at 29.

Again, the ALJ incorrectly relied upon the description of Plaintiff's cognitive deficits as mild, which again is not a finding made by doctors but a diagnosis and is not support for the ALJ's

conclusion that this contradicts Dr. Dallara's "severe memory limitations." Tr. at 28-29. Nor are the additional findings supported by the ALJ that Plaintiff could complete simple household tasks and he was largely cooperative, which showed he could interact with people on a superficial basis. *Id*. at 28-29.

In summary, the ALJ's failure to properly address Plaintiff's mental impairments and the restrictions opined by Dr. Rucker and Dr. Dallara requires remand of this case for further review, analysis, and articulation.

### D.     STEP FIVE

Plaintiff also asserts that the ALJ failed to meet her Step Five burden of proving that a significant number of jobs were available for Plaintiff. ECF Dkt. #12 at 24-26. Since the Court is remanding this case for the ALJ to reexamine and provide proper articulation as to her treatment of the opinions of Drs. Rucker and Dallara, this claim of error will not be addressed as the ALJ's redetermination of those opinions may change and thus impact the ALJ's Step Five analysis.

## VI.    CONCLUSION

For the following reasons, the Court REVERSE the decision of the ALJ and REMANDS the instant case for reexamination, analysis and articulation of her treatment of the opinions of Plaintiff's treating physician Dr. Rucker and the consultative opinions of Dr. Dallara.


Date: September 7, 2018                    */s/George J. Limbert*
                                           GEORGE J. LIMBERT
                                           UNITED STATES MAGISTRATE JUDGE